596 So.2d 1020 (1992)
Warfield Raymond WIKE, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 74722.
Supreme Court of Florida.
February 27, 1992.
Rehearing Denied April 1, 1992.
*1021 Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Gypsy Bailey and John M. Koenig, Jr., Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
Warfield Raymond Wike, Jr., appeals his conviction and sentence of death for first-degree murder and his convictions and sentences for kidnapping, sexual battery, and attempted murder. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm his convictions and sentences for all offenses except his sentence of death for first-degree murder.
The facts reflect that at approximately 6:30 a.m. on September 22, 1988, a couple found eight-year-old Sayeh Rivazfar alongside a rural road in Santa Rosa County. Sayeh was waving one hand and held the other to her throat. The couple noticed that Sayeh's throat was cut and immediately drove her to a store to call for help. During the drive, Sayeh told the couple that a man named "Ray" had taken her and her sister from their home and to the woods where he cut her throat and killed her six-year-old sister, Sarah. Later at the hospital, it was determined that Sayeh suffered a cut throat and two lacerations to her vagina which were consistent with forced penetration.
A search for Sarah Rivazfar began shortly after Sayeh was found. Sarah's body was found in the woods about seventy-five feet from the dirt road where Sayeh was picked up. Footprints were also found at the scene. Sarah's hands were tied behind her back and her throat had been cut. Crime scene technicians recovered several items of evidence from three separate locations near the area where the body was found. These included pieces of shirt material, tire tracks, and blood stains.
On the information investigators gathered from Sayeh and her mother, they determined that Wike was a suspect. Officers immediately went to the Wike residence. From neighbors they learned that an elderly couple, a thirty-year-old man, and a child lived in the house. They also learned that the elderly man was confined to a wheelchair. Parked in front of the house was an older model green Dodge automobile, with a dent on the side, which fit the description given by Sayeh and her mother as being Wike's car. A computer check revealed that the car was registered to a Raymond Wike. Although no one answered when an officer rang the front *1022 doorbell, another officer heard movement inside. The officers had the dispatcher call the house. A man named Ray answered. He was asked to come outside with his hands on his head. When he did, the officers arrested him on the spot. Then the officers conducted a sweep of the house to determine if there were other occupants. After the sweep, the officers obtained a search warrant and searched the house and the car and seized several items of evidence from each. The automobile was also seized.
Wike was indicted for murder, attempted murder, sexual battery, and kidnapping. Counts I and II charged premeditated murder and felony murder, respectively, for the death of Sarah. Counts III and IV charged the kidnapping of Sarah and Sayeh. Count V charged sexual battery of Sayeh, and Counts VI and VII charged attempted premeditated murder and attempted felony murder of Sayeh.
At trial, Patricia Rivazfar, the girls' mother, testified that she and her children had known Ray Wike for a little over a year. Evidence seized from Wike and his vehicle established that: Wike, being a type "A" secretor, could have contributed to the semen stains found on various items in the car; (2) semen stains from a type "A" secretor were found on the torn pink bathing suit found in the car; (3) a child's sock found on the car had type "O" bloodstains, matching Sayeh's type; (4) the car seat material had type "O" bloodstains, as did the underpants that Sayeh wore; and (5) other bloodstains matching Sarah's type "O" were found on the pine needles obtained from the scene where Sarah's body was located and also on clothing material, tennis shoes, and a blue blanket seized from the carport. Further DNA testing of the blue blanket identified the type "O" blood found as positively coming from Sayeh. Additionally, a hair expert testified that, from a piece of torn material found at the scene, she found two head hairs that were consistent with Wike's hair. She also testified that two pubic hairs consistent with Wike's were found, and that other head hairs were found consistent with the hair of Sarah and Sayeh. An examination of the clothing from Sarah revealed a pubic hair consistent with Wike's, and a head hair consistent with Wike's was found on both Sarah's and Sayeh's underpants.
Fingerprint evidence was presented that established two palm prints matching Sayeh's were found on the trunk of Wike's car. One of these prints was made in blood or a substance of a high protein content. Two palm prints matching Wike's were located on the edge of the trunk, and these prints were also made in a substance of high protein content. An expert in tire track comparisons testified that plaster casts and photographs of the tire tracks found at the scene matched the tires from Wike's car.
Sayeh testified that she and Sarah went to bed on September 22 around 8 p.m. She explained that they both wore their clothes to bed since they were sometimes late for the bus in the morning. She stated that she woke up in a car parked in front of her house and that she recognized the man's voice as her mother's friend Ray. Since she was not fully awake, she went back to sleep. Furthermore, she stated that the man put Sarah in the back seat of the car and, when she asked for her mother, Ray told her that her mother was coming. Sayeh remembered traveling on a paved road, which then turned into a dirt road. The child stated that, when they stopped, Wike raped her on the trunk of the car. Afterwards, they then got back into the car and proceeded to a different location, where they stopped again and walked in the woods. At that point, Ray pulled a knife with finger grips on it and told Sayeh to say a prayer and then cut her throat with the knife. She explained that Sarah was screaming and then Ray cut her throat and left.
Wike testified in his own defense and denied involvement in any of the crimes committed against the girls. Wike explained that somebody else could have used the car because he had been drinking and smoking marijuana that night. The jury found Wike guilty of all charges.
*1023 The trial court scheduled the penalty phase for the following morning. Counsel for Wike moved for a one-week continuance, which was denied. The trial court also conducted a hearing to determine if Wike should be shackled during the penalty phase proceeding because of threats he made to a bailiff regarding the prosecutor. The trial court ordered Wike shackled, but had the counsel tables draped with blankets in order so that the shackles would not be visible. Wike's hands were handcuffed in front. During the penalty phase, the state introduced Wike's 1974 conviction for robbery and an additional photograph of Sarah's body.
The defense introduced the results of a drug test performed on Wike the day after the offense, which showed the presence of marijuana in his bloodstream. Wike's mother testified by a stipulated statement read to the jury regarding Wike's family background. She stated that Wike's father was considerably older than she and had died when Ray was eight years old. She also stated that she had a nervous breakdown. She explained that, as a single parent, she had difficulty disciplining Wike since his father provided all the discipline while he was alive. She stated that Ray had regularly run away from school. Furthermore, she stated that Ray was divorced and had a child with another woman with whom he had lived after the divorce. She stated that she and her husband, Ray's stepfather, adopted the child, and that Ray had lived with them until there was a dispute over his financial contribution to the household.
Wike testified on his own behalf. He stated that he grew up without a father. Wike explained that at age fourteen he began using alcohol and started with drugs, and that he used almost every type of drug except heroin. Furthermore, he stated that for the three years prior to his arrest he used nothing but alcohol and marijuana. In 1973, he entered the Navy but received an honorable medical discharge six months later. Wike testified that he suffers from the degenerative disease of the spinal column which affects the production of bone marrow. He explained that he was upset by the guilty verdict and could not accept it in his heart or mind; and that he was numb, particularly since the offenses were committed against someone he knew and cared about. The jury recommended imposition of the death penalty by a vote of nine to three.
In imposing the death sentence, the trial judge found the following five aggravating circumstances: (1) that Wike was previously convicted of a felony involving the use or threat of violence to a person; (2) that the evidence presented at the guilt phase of the trial established that the murder was committed while in the commission of kidnapping and sexual battery; (3) that the killing of Sarah was committed to avoid capture after having kidnapped the girls and having sexually battered Sayeh; (4) that the totality of the evidence established that the murder of Sarah was especially heinous, atrocious, or cruel; and (5) that this crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Regarding the mitigating circumstances, the trial judge recognized that the record "does establish that [Wike] has a problem of substance abuse." The judge addressed other mitigating circumstances, stating he had
carefully considered other possible mitigating factors, including but not limited to, a) the defense's position that he has no prior significant criminal record, b) poor family structure and upbringing, c) genetic problems; d) the quick death of the victim, e) adequacy of other sentences, and finding that none of these [mitigating factors] have been established except the Court does determine that the Defendant had a history of substance abuse, but finds no evidence that his ability to conform his conduct to the requirements of the law was substantially impaired on this occasion.
The judge imposed the death sentence for the first-degree murder of Sarah Rivazfar and imposed a sentence of twenty-two years on each of the two counts of kidnapping, a life sentence on the sexual battery, and a sentence of twenty-two years on the *1024 attempted murder, all of which are to run concurrently.

Guilt Phase
In the guilt phase of the trial, Wike claims the trial court erred by: (1) denying the motion to suppress evidence obtained as the result of the warrantless arrest of Wike in his parents' home; and (2) denying a motion for a judgment of acquittal to the kidnapping counts and allowing the felony murder theory of the prosecution based, in part, on the kidnapping. The second claim is without merit and requires no discussion.
Regarding the first claim, there was evidence from the surviving witness and her mother identifying Wike as the perpetrator of these offenses. Immediately, the officers acted on that information. When the officers arrived at the address where Wike was located, the officers saw a green Dodge automobile with a dent, just as the victim had described. The officers then noticed what appeared to be bloodstains on the seat of the car. Upon investigation, they learned from neighbors that an elderly couple and a small boy also resided in the house with the thirty-year-old man and that the elderly man was confined to a wheel chair. The officers testified that they were concerned that other members of the household might be in danger. When an officer rang the doorbell, no one answered. Then the officers had a dispatcher phone the house. Wike answered the phone and was asked to come outside with his hands on his head.
Wike argues that he was coerced to leave the house by the police officers' show of force and, since his arrest was without a warrant, the arrest and subsequent search of the house and car were illegal. We disagree. This record establishes that this was an immediate ongoing investigation and that this arrest occurred as soon as possible after the information was received and acted upon.
Wike principally relies on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), which prohibits nonconsensual warrantless entry into a home to make a routine felony arrest, absent exigent circumstances. We find that the facts in this case comply with the exigent circumstances standard as explained by the Eleventh Circuit in United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir.), cert. denied, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987), in which it stated:
Exigent circumstances do not necessarily involve "hot pursuit" of a fleeing criminal. Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public.
We find all five elements present under the circumstances of this case. There is no question that the first four have been established. We find that the fifth element was established by the fact that other people in the house could have been in danger and the fact that Wike, knowing he would soon be apprehended, could destroy essential evidence. We conclude that the evidence in this record clearly establishes the requisite probable cause for this arrest and also establishes the exigent circumstances that justify the manner of the arrest and seizure.

Penalty Phase
Wike raises four claims relating to the penalty phase, in which he asserts that the trial court erred in: (1) failing to dismiss a juror for cause; (2) ordering Wike shackled; (3) denying Wike's request for a continuance; and (4) allowing the prosecutor to cross-examine Wike on the issue of remorse.
We need address only Wike's third claim, relating to the trial judge's denial of his motion to continue the penalty phase, because, under the circumstances of this record, we find the continuance should have been granted. The penalty phase was *1025 scheduled to begin the morning following the rendition of the guilty verdicts. On that morning, defense counsel requested a one-week continuance for the purpose of procuring additional mitigating witnesses, e.g., Wike's mother, who at that time could not testify due to health problems but might be able to testify in a week; a cousin who was due to arrive in town that night; and Wike's ex-wife, who had just been located and could provide important family background information, particularly about Wike's alcohol and drug abuse. After the State agreed to stipulate to Wike's mother's testimony without her having to testify, the court denied the motion for a continuance.
The general rule is that the granting or denying of a motion for continuance is within the discretion of the trial court. Williams v. State, 438 So.2d 781, 785 (Fla. 1983), cert. denied, 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 146 (1984); see also Magill v. State, 386 So.2d 1188 (Fla. 1980), cert. denied, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981); Jarvis v. State, 115 Fla. 320, 156 So. 310 (1934). Given the circumstances of this case, we conclude that the trial court abused its discretion in denying Wike's motion for a continuance. We emphasize that Wike's request for a continuance was for a short period of time and for a specific purpose. It is clear that Wike's family members, specifically, his cousin and ex-wife, could have provided admissible evidence for the jury to consider during the penalty phase had the continuance been granted. Ordinarily, we are reluctant to invade the purview of the trial judge; however, we find that the failure to grant a continuance, if only for a few days, under these circumstances was error. Consequently, we must remand this case for a new penalty phase proceeding before a new jury.
In order to avoid problems in the new penalty phase proceeding, we also address Wike's fourth claim, that the prosecutor improperly argued lack of remorse as a nonstatutory aggravating factor. During the penalty phase, Wike testified in his own behalf and, on direct examination, stated that he was kind of numb about having been convicted of the type of crime that had been committed "against someone I knew and someone I cared for and spent a lot of time with." On cross-examination, the prosecutor suggested that Wike showed no signs of remorse when told of the nature of the crimes committed against the girls, whom he had known for about a year. Furthermore, in his closing argument, the prosecutor emphasized Wike's lack of remorse to the jury. We find that the use of lack of remorse in this manner was error. See Pope v. State, 441 So.2d 1073 (Fla. 1983); Patterson v. State, 513 So.2d 1263 (Fla. 1987); McCampbell v. State, 421 So.2d 1072 (Fla. 1982). Because of our holding on the continuance issue, we need not address whether or not the prosecutor's comments were harmless error under State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
For the reasons expressed, we affirm Wike's convictions and sentences for all offenses except the sentence of death for first-degree murder. We remand this cause to the trial court for a new penalty phase proceeding before a new jury within 120 days from the date this opinion becomes final.
It is so ordered.
SHAW, C.J., and McDONALD, BARKETT and KOGAN, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion, in which GRIMES, J., concurs.
OVERTON, Justice, concurring in part, dissenting in part.
While I concur in the majority's holding regarding the guilt phase, I dissent from the majority's finding of an abuse of discretion in denying the motion for continuance and directing a new penalty phase proceeding. I do not find that the trial court abused its discretion in denying the motion for continuance and, further, would conclude that the prosecutor's cross-examination and argument to the jury concerning lack of remorse was harmless error under the circumstances of this case, if it was *1026 error at all. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
GRIMES, J., concurs.