653 So.2d 1009 (1995)
Jimmie Lee CONEY, Appellant,
v.
STATE of Florida, Appellee.
No. 80072.
Supreme Court of Florida.
January 5, 1995.
Rehearing Denied April 27, 1995.
*1010 Bennett H. Brummer, Public Defender, and Howard K. Blumberg, Asst. Public Defender, Eleventh Judicial Circuit, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Anita J. Gay, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Jimmie Lee Coney. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Jimmie Coney set his putative jailhouse lover ablaze. Coney was incarcerated in the Dade Correctional Institution (DCI) serving a 420-year sentence for sexual battery, robbery, burglary with assault, and attempted murder, all arising from the assault of a twelve-year old girl in 1976. While at DCI, *1011 Coney's homosexual lover, Patrick Southworth, spurned him. Coney obtained a key to Southworth's cell, entered at about 5 a.m., April 6, 1990, doused him with a flammable liquid, and set him afire. Southworth was burned over a large portion of his body, remained conscious for several hours, lapsed into unconsciousness, and died the following day. No one saw the crime take place except Southworth, who awoke when the liquid was splashed on him. An empty "butt can" was found under Southworth's bunk, and a shoebox containing empty soda cans, tissue paper, and cell keys was found in a garbage container near the fire. The cans contained trace amounts of a flammable liquid and the keys fit Southworth's cell door.
A prison official testified at trial that Southworth told him shortly after he was burned that when he felt the liquid poured on him he looked up and saw James Coney. He said Coney set him on fire because he, Southworth, is a homosexual. The paramedic who treated the victim testified that Southworth told him that his lover set him on fire because he, Southworth, left him. The prison officer who accompanied Southworth to the hospital testified that Southworth told him that Jimmie Coney did it because he, Southworth, would no longer have sex with him.
Inmate Young testified that a week before the murder Coney asked him to get some lacquer thinner from the prison auto shop. Young gave him the liquid in a soda can. Inmate Hoover testified that Coney and Southworth were often seen together touching and that Coney introduced Southworth to Hoover as "his boy," i.e., his homosexual lover. On the day before the murder, Coney seemed angry at Southworth and told Hoover, "I'm going to get that motherfucker... . I'm going to burn his ass." Coney's cellmate, inmate Jones, testified that at 4 a.m. on the night of the murder, Coney awoke, took the shoebox later found near the fire from under his bed, poured paint thinner from two soda cans into a "butt can," left the cell, and returned later announcing, "got the key."
Coney was convicted of first-degree murder and arson. The State put on the following witnesses during the penalty phase: Former Assistant State Attorney Jacobs testified concerning the details of Coney's prior rape of an eighteen-year-old woman who had car trouble. Coney abducted her, bit her on the face and leg, and raped her. Next, a young woman testified that Coney forced his way into her house when she was twelve years old and sexually assaulted and strangled her, leaving her for dead. The woman's mother testified concerning her daughter's condition when she, the mother, arrived home following the assault. Coney, in turn, put on eight witnesses, including relatives who testified concerning his childhood and upbringing. The jury recommended death on the first-degree murder charge by a seven-to-five vote, and the judge imposed death, finding five aggravating and no mitigating circumstances.[1] The judge imposed a thirty-year consecutive sentence on the arson charge. Coney appeals his convictions and sentences, raising ten issues.[2]
Coney first claims that the trial court erred in failing to give a requested jury instruction on dying declarations. As noted above, three State witnesses gave key testimony concerning Southworth's statements to them before he died; two testified that Southworth said that Coney did it. Defense counsel requested the following instruction:

*1012 A statement claimed to have been made by the deceased, Patrick Southworth, has been placed before you. That statement is claimed to have been made while Patrick Southworth was conscious of immediate and impending death. Such a statement should always be considered with caution and be weighed with great care to make certain that Patrick Southworth was conscious of immediate and impending death.
Therefore, you must determine from the evidence that Patrick Southworth's statement was made while he was conscious of immediate and impending death.
If you conclude that Patrick Southworth's statements were not made when he was conscious of immediate and impending death, you should disregard it.
The court refused to give the instruction, concluding that it would be error to do so.
This Court addressed this issue in Soles v. State, 97 Fla. 61, 119 So. 791 (1929), wherein we ruled that it would be error to give a special instruction on dying declarations:
"That the judge is to pass on the preliminary condition necessary to the admissibility of evidence is unquestioned. It follows, as of course, that, since a consciousness of impending death is according to the foregoing principles legally essential to admissibility, the judge must determine whether that condition exists before the declaration is admitted.
"After a dying declaration, or any other evidence has been admitted, the weight to be given to it is a matter exclusively for the jury. They may believe it or may not believe it; but, so far as they do or do not, their judgment is not controlled by rules of law. Therefore, though they themselves do not suppose the declarant to have been conscious of death, they may still believe the statement; conversely, though they do suppose him to have been thus conscious, they may still not believe the statement to be true. In other words, their canons of ultimate belief are not necessarily the same as the preliminary legal conditions of admissibility, whose purpose is an entirely different one. It is, therefore, erroneous for the judge, after once admitting the declaration, to instruct the jury that they must reject the declaration, or exclude it from consideration, if the legal requirement as to consciousness of death does not in their opinion exist. No doubt they may reject it, on this ground or any other; but they are not to be expected to follow a definition of law intended for the Judge."
Id. at 64-65, 119 So. 791 (citations and emphasis omitted) (quoting 3 John Henry Wigmore, Wigmore on Evidence § 1451 (2d ed. 1923)).
Whether a hearsay statement is nevertheless reliable and admissible because it was made with the knowledge of impending doom is a legal question for the judge. Once the judge decides in favor of admissibility, the statement passes into the realm of the trier of fact to determine weight, character, and credibility, and it would be error for the judge to comment on it. See Fenelon v. State, 594 So.2d 292, 294 (Fla. 1992) ("[T]he judge should not invade the province of the jury by commenting on the evidence or indicating what inferences may be drawn from it.").[3] We find no error in the present case.
Coney next claims that the court erred in conducting in his absence two conferences: a pretrial meeting between the lawyers and judge, and a voir dire bench conference. As to the pre-trial meeting, Florida Rule of Criminal Procedure 3.180 states that "the defendant shall be present ... at any pretrial conference, unless waived by the defendant in writing." Here, although the defense lawyer purported to waive Coney's presence at the meeting, there was no express waiver by Coney himself. This was error. See Garcia v. State, 492 So.2d 360 (Fla.), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). A review of the record, however, shows that the meeting was a routine status conference prompted by a delayed trial date, wherein several technical, procedural, and legal issues *1013 were discussed.[4] Coney's presence would not have assisted the defense in any way. The error was harmless. Id.
As to Coney's absence from the bench conference, this Court has ruled:
[The defendant] has the constitutional right to be present at the stages of his trial where fundamental fairness might be thwarted by his absence. Florida Rule of Criminal Procedure 3.180(a)(4) recognizes the challenging of jurors as one of the essential stages of a criminal trial where a defendant's presence is mandated.
Francis v. State, 413 So.2d 1175, 1177 (Fla. 1982) (citations omitted). Florida Rule of Criminal Procedure 3.180 provides:
(a) Presence of the Defendant. In all prosecutions for crime the defendant shall be present:
....
(4) at the beginning of the trial during the ... challenging ... of the jury.
Fla.R.Crim.P. 3.180(a).
We conclude that the rule means just what it says: The defendant has a right to be physically present at the immediate site where pretrial juror challenges are exercised. See Francis. Where this is impractical, such as where a bench conference is required, the defendant can waive this right and exercise constructive presence through counsel. In such a case, the court must certify through proper inquiry that the waiver is knowing, intelligent, and voluntary. Alternatively, the defendant can ratify strikes made outside his presence by acquiescing in the strikes after they are made. See State v. Melendez, 244 So.2d 137 (Fla. 1971). Again, the court must certify the defendant's approval of the strikes through proper inquiry. Our ruling today clarifying this issue is prospective only.
Juror challenges in the present case were exercised on two occasions: first, during a brief bench conference after prospective jurors had been polled concerning their willingness to impose death, and second, during a lengthy proceeding at the conclusion of voir dire. Coney was not present at the sidebar where the initial challenges were made, and the record fails to show that he waived his presence or ratified the strikes. The State concedes that this rule violation was error, but claims that it was harmless. We agree.[5]Francis. Again, the record shows no prejudice to Coney. During the brief conference, several jurors were struck for cause by both the State and defense because of their views on the death penalty. None were excused peremptorily. The excusals "involved a legal issue toward which [Coney] would have had no basis for input," i.e., the death-qualifying of prospective jurors. Harvey v. State, 529 So.2d 1083, 1086 (Fla. 1988), cert. denied, 489 U.S. 1040, 109 S.Ct. 1175, 103 L.Ed.2d 237 (1989). The error was harmless.
Coney claims that the court erred in allowing the mother of the twelve-year-old rape victim to testify during the penalty phase concerning four prior violent felonies committed by Coney: a sexual battery, robbery, burglary with assault, and attempted murder. The victim, who was twenty-eight at the time of trial, first recounted the details of the sexual battery, robbery, and burglary. She told of how Coney knocked at her door and asked if she needed yard work done; forced his way into her home; made her perform oral sex on him; attempted to rape her; dragged her from room to room by her braided hair; and finally raped her so brutally she required reconstructive vaginal surgery. She could provide few details concerning the attempted murder. All she remembered *1014 was that Coney tied a macrame cord around her neck and she passed out.
The State then proffered a statement by the girl's mother giving additional details of the assault, and the court ruled the testimony admissible:
THE COURT: I'm going to allow her to testify... . I'm also going to allow the state to ask her about what she observed when she arrived home, because that is the essence of the probative nature of this in the testimony, is the degree of the violent attack in that case, and the victim really couldn't testify about that. She certainly explained what had happened, but from her testimony, I don't think you would understand  a jury would understand how  well, the effect of strangling  trying to strangle her or tying the rope around her neck. The fact that the injury was really quite severe from that, which is probably one of the most violent aspects of that attack. So I think it's probative.
The mother testified that when she called home from work at lunchtime that day, her daughter rasped into the telephone, "Help me, help me." The mother described how she rushed home, flagging down a police car, and found the following:
When [the officer and I] arrived, pulled up in front of the house, the front door was open, and he and I rushed in together, and I found my daughter, Susan, on a couch. I looked at her and her head was purple and just huge. I mean, way larger than anybody's head, and I looked. She had a cord tied around her neck in a knot and she was semiconscious.
And the officer  I mean, I was looking. The officer said, "Get a knife, get something to get this off." So I found a knife in my kitchen. He cut the cord off, and I looked at her and her eyes were opening and closing. Her eyes were blood red and her face was purple, and as I said, she was semiconscious.
She was totally nude and she was covered partially with a little blue blanket. And as he picked her up, there was blood on her chest and there was blood running from her vagina, from the lower part of her body. There were no clothes. Blood was running down her legs.
And he picked her up like a baby and we rushed out the door. And we were going  and at that time the Rescue pulled up in front of my house, so we got into that. And I went with them and we went to Coral Reef hospital.
The mother then identified for the court a photograph of her daughter taken several days after the assault.
This Court has held that it is appropriate in the penalty phase to introduce evidence of the circumstances surrounding a prior violent felony in order to show the defendant's character, as long as the probative value outweighs any prejudicial effect. Rhodes v. State, 547 So.2d 1201 (Fla. 1989). The court allowed the mother to testify in the present case to provide important details of the strangling that the daughter was unable to give. The record supports this ruling. The daughter testified in detail about all aspects of the assault leading up to the attempted murder, but then her account abruptly ended:
[A.] And we had been doing macrame things and there was some cord there, and he tied it around my neck. And I asked him not to, I wouldn't tell. And he still did it. And I don't remember. I passed out after that.
Because of the daughter's young age at the time of the assault and her inability to provide virtually any details of the acts giving rise to Coney's attempted murder conviction, we conclude that the trial court acted within its discretion in admitting the mother's testimony concerning the strangling.
To the extent the mother's testimony included details of the assault unrelated to the actual strangling, this was error. Her testimony concerning the naked, bleeding child in particular was unnecessary and inflammatory. On this record, however, we find the error harmless for two reasons. First, the mother's improper testimony was brief, comprising only a few lines in a penalty phase transcript of several hundred pages. And second, although the mother's testimony was inflammatory, it was vastly overshadowed by the daughter's own first-hand account *1015 of the sexual battery, robbery, and burglary. We conclude that there is no reasonable possibility that the mother's improper statement contributed to the jury's recommendation of death.
Coney contends that the court erred in finding as an aggravating circumstance that he knowingly created a great risk of death to many persons when he set Southworth afire. See § 921.141(5)(c), Fla. Stat. (1989). We agree. We stated in Kampff v. State, 371 So.2d 1007, 1009 (Fla. 1979): "`Great risk' means not a mere possibility, but a likelihood or high probability." Here, the fire was relatively small, was contained within a single cell, was set in an area under constant surveillance, and was easily extinguished with several puffs from a fire extinguisher. We find, however, that there is no reasonable possibility this error affected the death sentence where four strong aggravating factors remain and the court specifically stated in its sentencing order that "there are more than sufficient aggravating circumstances proven beyond a reasonable doubt to justify the imposition of the death penalty." The error was harmless.[6]
Based on the foregoing, we affirm Coney's convictions and sentences.
It is so ordered.
SHAW, HARDING and WELLS, JJ., and McDONALD, Senior Justice, concur.
GRIMES, C.J., concurs in result only.
OVERTON, J., concurs in result only with an opinion, in which GRIMES, C.J., concurs.
KOGAN, J., recused.
OVERTON, Justice, concurring in result only.
I totally disagree with the majority's holding that a defendant who is present in the courtroom at counsel table is not present for the purposes of jury challenges made at the bench. In my view, this is a ridiculous result. Clearly, in adopting Florida Rules of Criminal Procedure 3.180 and 3.315, such a result was not the intention of this Court. These two rules were adopted at different times for different purposes.
Rule 3.180(a)(4), directing that the defendant shall be present "[a]t the beginning of the trial during the examination, challenging, impanelling, and swearing of the jury," was adopted in 1968. That rule ensures that a defendant has knowledge of the proceedings and is always readily available to counsel for input into critical decisions affecting the defendant's case. Rule 3.315, directing that challenges to a jury panel should be made to the court "outside the hearing of the jury," was adopted twelve years later, in 1980. The latter rule was adopted to provide a uniform procedure for exercising challenges to prospective jurors. Because the rule requires that challenges be made outside the hearing of the jury, of necessity, such challenges are made at the bench.
Before rule 3.315 was adopted, most jurisdictions had a procedure that required lawyers to make juror challenges from counsel table within the hearing of the court and jury. When rule 3.315 was adopted, neither I, as a strong advocate for the rule, nor the other members of this Court conceptualized that the effect of this rule would require the defendant to be present at the bench. Such a requirement is, in my view, inherently unworkable and will undoubtedly cause both operational and security problems in courtrooms throughout this state, often to the point of absurdity. For example, many courtrooms are not large and the bench area that is available for bench conferences outside the hearing of the jury is severely limited. Defendants must often be accompanied by security personnel and trials sometimes involve more than one defendant. Thus, under the majority's interpretation of the rules, bench conferences regarding juror challenges *1016 will now require that the lawyers, defendants, security personnel, and court reporters all be present at the bench. Additionally, the risk of escape could be increased because courtroom exits are frequently located near the bench. Of equal concern are instances when security concerns require defendants to be in shackles. When that is the case, court personnel frequently go to great lengths to shield the shackles from the jury's view to prohibit any prejudice to the defendant as a result of the shackling. Under those circumstances, it would likely be impossible that a defendant could walk to the bench without the jury seeing the shackles. In summary, requiring a defendant's presence at the bench is unworkable, is not necessary to protect a defendant's rights, and was not intended by this Court when it adopted rule 3.315.
Further, I do not believe that our decision in Francis v. State, 413 So.2d 1175 (Fla. 1982), controls the circumstances of this case. The challenges at issue in that case were discussed and made by the lawyers and the judge outside of the courtroom where the defendant was not readily available for consultation with counsel. Unlike the defendant in Francis, the defendant in this case was readily available to counsel and physically present in the courtroom at the time the challenges were made.
Judges have believed for nearly fifteen years that exercising challenges at the bench, outside the hearing of the jury while the defendant was at counsel table, was proper because the defendant was present in the courtroom. As of today, however, the presence of the defendant at bench conferences regarding juror challenges will always be required absent a specific waiver or ratification by the defendant. I strongly believe that the rules do not require the presence of the defendant at the bench. I would hold that a defendant who is physically present in the courtroom and who is readily available to counsel is present for purposes of the rules.
GRIMES, C.J., concurs.
NOTES
[1] The judge found that the following aggravating circumstances were present: The murder was committed by a person under sentence of imprisonment; the defendant had been previously convicted of a violent felony; the defendant created a great risk of death to many; the murder was committed during the course of an arson; and the murder was especially heinous, atrocious, or cruel.
[2] Coney claims the trial court erred in addressing the following matters: 1) refusing to give a requested jury instruction on dying declarations; 2) admission of dying declarations concerning Coney's motive for the assault; 3) Coney's absence during certain pre-trial and trial proceedings; 4) limiting of defense counsel's questioning of jurors concerning the State's burden of proof; 5) various other guilt phase issues; 6) testimony of the child rape victim's mother concerning a prior violent felony; 7) improper argument by the prosecutor; 8) proportionality; 9) the aggravating circumstance of knowingly creating a great risk of harm to many; 10) failure to find and weigh nonstatutory mitigation.
[3] See also Fla.Std.Jury Instr. (Crim.) 16-20 (Other than the routine jury instruction on weighing the evidence, standard instructions on evidentiary matters in criminal cases are available in only two instances not involving the defendant: where an expert testifies, and where an accomplice testifies).
[4] The following took place at the meeting: The lawyers and judge discussed the court calendar, the availability of a particular courtroom, and the scheduling of witnesses; the prosecutor summarized the crime for the judge, who was unfamiliar with the case (defense counsel declined "to go into the case" for the judge); the prosecutor summarized the State's penalty phase evidence; and the prosecutor outlined the hearsay evidence he was going to seek to admit.
[5] We do not construe Florida Rule of Criminal Procedure 3.180(a)(5) to include bench conferences in which counsel and the court discuss purely legal issues. Cf. Hardwick v. Dugger, 648 So.2d 100, 105 (Fla. 1994) ("[A] defendant has no constitutional right to be present at the bench during conferences that involve purely legal matters.").
[6] We dispose of the remainder of Coney's claims as follows: issue 2 (not preserved); issue 4 (not preserved); issue 5 (no error as to Officer Sanchez's prior consistent statements; harmless error as to the trial court's refusal to allow defense counsel to question Severence whether Jones was a "snitch;" no error in allowing testimony that Coney and Southworth were caught naked under the bedsheets a few days before the murder; no error in allowing the State arson expert to testify concerning the sealing of the cans of flammable liquid); issue 7 (not preserved); issue 8 (no error); issue 10 (no error).