813 So.2d 12 (2002)
Warfield Raymond WIKE, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-2141.
Supreme Court of Florida.
January 24, 2002.
Rehearing Denied March 15, 2002.
*13 Baya Harrison, III, Monticello, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney *14 General, Tallahassee, FL, for Appellee.
PER CURIAM.
Warfield Raymond Wike appeals an order of the circuit court denying a motion for postconviction relief after an evidentiary hearing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's order denying Wike postconviction relief.
Wike, who was thirty-two years old at the time of the offenses, was convicted of first-degree murder, two counts of kidnaping, sexual battery, and attempted murder. See Wike v. State, 596 So.2d 1020 (Fla. 1992). The facts of the crime are detailed in this Court's opinion on direct appeal.
The facts reflect that at approximately 6:30 a.m. on September 22, 1988, a couple found eight-year-old Sayeh Rivazfar alongside a rural road in Santa Rosa County. Sayeh was waving one hand and held the other to her throat. The couple noticed that Sayeh's throat was cut and immediately drove her to a store to call for help. During the drive, Sayeh told the couple that a man named "Ray" had taken her and her sister from their home and to the woods where he cut her throat and killed her six-year-old sister, Sarah. Later at the hospital, it was determined that Sayeh suffered a cut throat and two lacerations to her vagina which were consistent with forced penetration.
A search for Sarah Rivazfar began shortly after Sayeh was found. Sarah's body was found in the woods about seventy-five feet from the dirt road where Sayeh was picked up. Footprints were also found at the scene. Sarah's hands were tied behind her back and her throat had been cut. Crime scene technicians recovered several items of evidence from three separate locations near the area where the body was found. These included pieces of shirt material, tire tracks, and blood stains.
On the information investigators gathered from Sayeh and her mother, they determined that Wike was a suspect. Officers immediately went to the Wike residence. From neighbors they learned that an elderly couple, a thirty-year-old man, and a child lived in the house. They also learned that the elderly man was confined to a wheelchair. Parked in front of the house was an older model green Dodge automobile, with a dent on the side, which fit the description given by Sayeh and her mother as being Wike's car. A computer check revealed that the car was registered to a Raymond Wike. Although no one answered when an officer rang the front doorbell, another officer heard movement inside. The officers had the dispatcher call the house. A man named Ray answered. He was asked to come outside with his hands on his head. When he did, the officers arrested him on the spot. Then the officers conducted a sweep of the house to determine if there were other occupants. After the sweep, the officers obtained a search warrant and searched the house and the car and seized several items of evidence from each. The automobile was also seized.
. . . .
At trial, Patricia Rivazfar, the girls' mother, testified that she and her children had known Ray Wike for a little over a year. Evidence seized from Wike and his vehicle established that: Wike, being a type "A" secretor, could have contributed to the semen stains found on various items in the car; (2) semen stains from a type "A" secretor were found on the torn pink bathing suit *15 found in the car; (3) a child's sock found on the car had type "O" bloodstains, matching Sayeh's type; (4) the car seat material had type "O" bloodstains, as did the underpants that Sayeh wore; and (5) other bloodstains matching Sarah's type "O" were found on the pine needles obtained from the scene where Sarah's body was located and also on clothing material, tennis shoes, and a blue blanket seized from the carport. Further DNA testing of the blue blanket identified the type "O" blood found as positively coming from Sayeh. Additionally, a hair expert testified that, from a piece of torn material found at the scene, she found two head hairs that were consistent with Wike's hair. She also testified that two pubic hairs consistent with Wike's were found, and that other head hairs were found consistent with the hair of Sarah and Sayeh. An examination of the clothing from Sarah revealed a pubic hair consistent with Wike's, and a head hair consistent with Wike's was found on both Sarah's and Sayeh's underpants.
Fingerprint evidence was presented that established two palm prints matching Sayeh's were found on the trunk of Wike's car. One of these prints was made in blood or a substance of a high protein content. Two palm prints matching Wike's were located on the edge of the trunk, and these prints were also made in a substance of high protein content. An expert in tire track comparisons testified that plaster casts and photographs of the tire tracks found at the scene matched the tires from Wike's car.
Sayeh testified that she and Sarah went to bed on September 22 around 8 p.m. She explained that they both wore their clothes to bed since they were sometimes late for the bus in the morning. She stated that she woke up in a car parked in front of her house and that she recognized the man's voice as her mother's friend Ray. Since she was not fully awake, she went back to sleep. Furthermore, she stated that the man put Sarah in the back seat of the car and, when she asked for her mother, Ray told her that her mother was coming. Sayeh remembered traveling on a paved road, which then turned into a dirt road. The child stated that, when they stopped, Wike raped her on the trunk of the car. Afterwards, they then got back into the car and proceeded to a different location, where they stopped again and walked in the woods. At that point, Ray pulled a knife with finger grips on it and told Sayeh to say a prayer and then cut her throat with the knife. She explained that Sarah was screaming and then Ray cut her throat and left.
Wike testified in his own defense and denied involvement in any of the crimes committed against the girls. Wike explained that somebody else could have used the car because he had been drinking and smoking marijuana that night. The jury found Wike guilty of all charges.
Id. at 1021-22.
After the penalty phase hearing, the jury recommended imposition of the death penalty by a vote of nine-to-three and the trial court imposed the death penalty. See id. at 1023. On appeal, this Court affirmed Wike's convictions, but remanded the case for a new penalty phase proceeding before a new jury, concluding that the trial court erred by denying Wike's motion to continue the penalty phase. See id. at 1025.
On remand, the jury unanimously recommended the death penalty, which the trial court subsequently imposed. See *16 Wike v. State, 648 So.2d 683, 684 (Fla. 1994). This Court on appeal, however, reversed Wike's sentence and remanded the cause for resentencing because the trial court erroneously denied Wike his vested procedural right to conclude the closing arguments before the jury. See id. at 684.
In Wike's third sentencing proceeding, the jury again unanimously recommended that Wike be sentenced to death. See Wike v. State, 698 So.2d 817, 819 (Fla. 1997). The Court explained:
In following that recommendation, the trial judge found four aggravating circumstances: prior violent felonies (1974 robbery, and contemporaneous attempted murder, kidnaping, and sexual battery of Sayeh); committed to avoid arrest; heinous, atrocious, or cruel (HAC); and cold, calculated, and premeditated (CCP). Additionally, the judge gave little or no weight to the statutory mitigating circumstance of age (Wike was 32 at the time of the murder). He also considered a number of nonstatutory mitigating circumstances. [Note 1.]
[Note 1.] The nonstatutory mitigating circumstances considered by the trial judge are as follows: Troubled childhood (little weight), mental and emotional disturbance due to father's death and troubled life (little weight), history of alcohol and drug abuse (some weight), under the influence of drugs and alcohol at time of crime (little weight because not corroborated by witnesses who observed Wike just after the crime), gainfully employed (little weight), serving life for sexual battery of Sayeh and able to serve life for this crime (some weight), has behaved well in prison and not likely to be dangerous in the future (little or no weight), and Wike has maintained his innocence (little or no weight).
Id. at 819. This Court affirmed, see id. at 823, and the United States Supreme Court denied review. See Wike v. Florida, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998).
Wike thereafter filed a motion for postconviction relief, raising fifteen claims.[1] After a Huff[2] hearing, the trial court determined that the following six claims required an evidentiary hearing: (7) ineffectiveness of counsel in failing to achieve suppression of evidence; (8) ineffectiveness of counsel for failing to investigate witnesses and present alibi evidence; (9) ineffectiveness of counsel in failing to move for change of venue; (10) ineffectiveness of counsel for failure to ensure Wike's presence at all critical stages of trial; (11) ineffectiveness of counsel for failing to ensure Wike's presence at sidebar conferences; and (14) ineffectiveness of counsel at the third penalty phase. After the trial *17 court conducted a hearing on these issues, the parties entered written post-hearing arguments. The trial court thereafter entered an order denying all of Wike's claims. Wike now appeals the trial court's denial of postconviction relief, raising five issues for this Court's review.

Ineffective Assistance of Counsel for Failing to File a Change of Venue Motion
Wike first contends that trial counsel was ineffective for failing to file a change of venue motion to have the trial moved out of Santa Rosa County.[3] In its order denying Wike relief on this issue, the trial court determined that trial counsel was not ineffective for failing to bring a change of venue motion against Wike's wishes. In addition, the trial court found that Wike had failed to establish that grounds for a venue change existed because both the State and defense counsel engaged in extensive voir dire before the trial, and the parties conducted individual voir dire of each prospective juror.[4] The trial court found that Wike had failed to demonstrate that he had substantial difficulty seating a jury in Santa Rosa County. Further, the trial court determined that the media exhibits that Wike introduced at the evidentiary hearing did not demonstrate inflammatory media coverage.
To establish a claim that defense counsel was ineffective, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216 (Fla.1998). In establishing deficiency, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. In establishing prejudice:
The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Here, the trial court determined that trial counsel's performance was not deficient. *18 Defense counsel discussed the venue issue with Wike, received affidavits from fifty individuals, and prepared for filing a motion for change of venue. Counsel's decision not to file the motion for change of venue was premised upon Wike's opposition to a change of venue. Competent, substantial evidence supports the trial court's findings of fact, and, under all of these circumstances, we agree that trial counsel's performance was not deficient.
Likewise, we agree with the trial court's determination as to the prejudice prong. The trial court determined that Wike failed to establish that grounds for a venue change existed, or that there was substantial difficulty in seating a fair or impartial jury. When applying the prejudice prong to a claim that defense counsel was ineffective for failing to move for a change of venue, the defendant must, at a minimum, "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court." Meeks v. Moore, 216 F.3d 951, 961 (11th Cir.2000); see also Provenzano v. Dugger, 561 So.2d 541, 545 (Fla.1990) (concluding that counsel was not ineffective for failing to renew the motion for change of venue because it was a tactical decision and because "it is most unlikely that a change of venue would have been granted because there were no undue difficulties in selecting an impartial jury"). We agree with the trial court's determination as to both prongs, and therefore, reject Wike's claim on this issue.

Ineffective Assistance of Counsel for Failing to Develop and Present a Viable Alibi Defense[5]
Wike next argues that his trial counsel was ineffective for failing to develop and present a viable alibi defense. Wike contends that he has always maintained his innocence, and he claims that he specifically advised his counsel, before the original trial, that he had an alibi for the night of September 21, 1988, and the early morning hours of September 22, 1988. In particular, he alleges that he went to the Silver Eagle Lounge in Pensacola until about 1:30 a.m. While there, he made several phone calls and finally contacted Angie Cooper (then Angie Faulk), whom he had been dating. Wike then drove his car to the Scenic Hills Lounge, and Cooper picked him up from there and took him to her residence. Wike stayed there until 5:45 a.m., when Cooper took him back to the Scenic Hills Lounge, where he got his car and then drove back to his parents' house. In addition, Wike contends that there were other witnesses who could have testified that he was somewhere other than the crime scene at the time of the abduction. In particular, Wike alleged that he had been seen by Glenda Hilliard at Fred's Bar as late as 11:50 p.m. and, after that, by Tammy Osborn at the Silver Eagle Lounge at 1:15 a.m. Furthermore, Wike contends that Angela Jones could place him at the Cove Tavern until 11 p.m., and Carolyn Neal told Mr. Martin, the investigator, that Wike arrived at the RaceTrac at midnight.
In response, the State contends that there is no one who could testify to Wike's whereabouts after 1:15-1:30 a.m., and many of those who Wike claims should *19 have been called as witnesses would have had unfavorable things to say about Wike. Accordingly, the State argues that Wike has not demonstrated any deficient attorney performance in the investigation and presentation of evidence at the guilt phase of his trial. In addition, the State contends that Wike has not demonstrated any prejudice because he cannot point to any evidence that trial counsel should have discovered or presented that could possibly have made any difference in the result of the guilt phase of the trial.
At the evidentiary hearing, Cooper testified that "there was no doubt in [her] mind" that Wike was not with her on the night of the crimes, and stated: "[H]e was not at my house." She also testified that she had not seen Wike for two to three weeks before the crimes. Defense counsel testified at the hearing that "in discussing the matter with Mr. Wike and reviewing the trial strategy that we had we concluded it was more important to have rebuttal argument than to present the issue regarding what I classify as pre-alibi witnesses."
In its order denying postconviction relief, the trial court reviewed the hearing testimony and concluded:
The record does not support the claim that counsel failed to investigate the use of alibi witnesses. With the exception of Ms. Faulk [Cooper], the Defendant failed to provide the name of a witness who could provide an alibi for the Defendant during the relevant time frame. As to Ms. Faulk [Cooper], when she was located, she positively denied she was with the Defendant during the period of time the crimes were committed. The decision not to call the "pre-alibi witnesses" to testify at trial was a tactical decision to gain the advantage of rebuttal in closing arguments and cannot be said to have prejudiced the Defendant or to have deprived him of a fair trial. See Strickland, 466 U.S. at 686, 104 S.Ct. 2052.
Competent, substantial evidence supports the trial court's findings. Indeed, Cooper clearly did not support Wike's alibi defense, nor has Wike demonstrated that any of the other witnesses could have provided an alibi for the relevant time frame either. Accordingly, Wike has failed to demonstrate that counsel's performance was deficient and that there is a reasonable probability that the outcome of the proceeding would have been different absent the alleged deficient performance. See Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997). We thus reject Wike's claim on this issue.

Ineffective Assistance of Counsel for Failing to Ensure That Wike Was Present at All Critical Stages of Trial
Wike's next argument is that defense counsel was ineffective for failing to ensure that Wike was present at all critical stages of trial. Specifically, Wike claims that he did not attend his arraignment, three docket calls, part of jury selection, and part of the trial.
This Court has held that a defendant has a "constitutional right to be present at the stages of his trial where fundamental fairness might be thwarted by his absence." Francis v. State, 413 So.2d 1175, 1177 (Fla.1982); see also Muhammad v. State, 782 So.2d 343, 351 (Fla.2001) ("Criminal defendants have a due process right to be physically present in all critical stages of trial."). Florida Rule of Criminal Procedure 3.180(a) provides, in pertinent part, that a defendant shall be present at first appearance; any pretrial conferences, unless he waives his presence in writing; during the examination, challenging, impaneling, and swearing of the jury; and at all proceedings before the court when the jury is present.
*20 At the evidentiary hearing on Wike's motion, defense counsel testified as follows:
[DEFENSE COUNSEL]: My normal practice was to have clients present at each docket day so they would know what was happening and why, and be present when things were happening. And without a specific recollection I would presume that happened in this case.
. . . .
[Q]: In fact, sir, as a defense attorney in this particular area what would you have done if the defendant was not present and something like this was going on?
[DEFENSE COUNSEL]: I certainly would have objected and refused to participate without him being present.
In its postconviction order, the trial court determined that the record reflects that Wike was present for arraignment. As for Wike's alleged absence during docket calls, the trial court determined that counsel was not ineffective for failing to secure Wike's presence at these docket calls, nor did Wike show that he had suffered any prejudice as a result of his absence. With regard to the first day of jury selection, the trial court determined that the general qualification of the jurors is not considered a critical phase of the trial at which the defendant's presence is required.[6]
With regard to the in-chambers preliminary conference that was held immediately after the general qualification of the jury and before jury selection, the trial court determined that Wike was absent, but that he was not prejudiced by his absence because no matters were discussed that required his input and no adverse rulings were made against him (defense counsel raised an in-court identification issue and a request to sequester the jury, and the trial court reserved ruling on both requests). Further, the trial court found that Wike was present before jury selection began during the individual voir dire. With regard to the second day of jury selection, the court found that Wike was present at the opening of jury selection.
Finally, with regard to Wike's claim that he was not present during the first two days of trial, the trial court found that the record neither affirmatively indicates Wike's presence, nor does it indicate his absence. Accordingly, the trial court relied upon trial counsel's testimony at the evidentiary hearing, along with the numerous references to Wike's presence throughout the trial, to find that counsel ensured Wike's presence during the first two days of trial.
Competent, substantial evidence supports the trial court's findings that Wike was present at arraignment, at jury selection on June 13, 1989, and at the first two days of trial. Accordingly, Wike has failed to demonstrate a preliminary basis for relief on this aspect of his claim. As to the stages where Wike was absent or where the record is not conclusive as to whether Wike was present or not, we agree with the trial court's conclusions that Wike was not prejudiced by any absence, and therefore, we reject Wike's claim on this basis.[7] *21 Accordingly, we affirm the trial court's denial of this claim.
Ineffective Assistance of Counsel for Failing to Ensure That Wike Was Present at Sidebar Conferences During the Third Penalty Phase
Wike next argues that defense counsel was ineffective for failing to ensure that he was present at sidebar conferences during the third penalty phase. In his post-hearing motion, Wike outlined seven bench conferences that occurred during the voir dire proceedings at which he was not present:
1. Wike's counsel requests that the court allow him to inform the venire that Wike has already been convicted of sexual battery and sentenced to 25 years in state prison. The court permitted counsel to do so.
2. Wike's counsel renewed his motion to sequester the jury, which the court denied.
3. A prospective juror advised the court that, for religious reasons, he cannot sit in judgment of another. Wike's counsel and the State stipulated (and the court agreed) to excuse this juror for cause.
4. A prospective juror advises the court that, due to past experiences with the state attorney's office, he could not be impartial. Wike's counsel and the State stipulated (and the court agreed) to excuse this juror for cause.
5. A prospective juror advises the court that she was previously molested and therefore, that she could not be impartial. Wike's counsel and the State stipulated (and the court agreed) to excuse this juror for cause.
6. A prospective juror advises the court that this venire person could not be impartial. Wike's counsel and the State stipulated (and the court agreed) to excuse this juror for cause.
7. A prospective juror advises the court that on the day of the offense, she worked and was present at the hospital where the surviving victim was taken, and she believed this could affect her ability to be impartial. Wike's counsel and the State stipulated (and the court agreed) to excuse this juror for cause.
The State contends that Wike has failed to demonstrate any prejudice as to any of these absences because he has neither suggested that he personally would have taken a different position than that taken by counsel at these sidebars, nor has he shown in what way the position taken by counsel at these sidebars was incorrect, strategically unwise, or otherwise subject to attack.
In Coney v. State, 653 So.2d 1009, 1013 (Fla.1995), this Court ruled that under our then-current rules of procedure, the defendant had a right to be present at the bench when pretrial juror challenges were exercised. Violation of that right, however, is subject to a harmless error analysis. See id. Although Coney has since been superseded by statute, see Amendments to Florida Rules of Criminal Procedure, 685 So.2d 1253, 1254 n. 2 (Fla.1996), it still applies to cases in which jury selection took place after April 27, 1995, and before January 1, 1997. See Muhammad, 782 So.2d at 353 n. 6. Because Wike's third penalty phase began on August 14, 1995, Coney is applicable to this case.
*22 In its order denying relief, the trial court determined that with regard to the bench conference concerning Wike's prior conviction, Wike had failed to demonstrate how his absence affected the outcome of the trial because no matters were discussed that required Wike's input and no adverse rulings were made against him. As for the bench conference regarding jury sequestration, the court determined that legal issues were discussed and that Wike's presence would not have assisted counsel, and therefore, Wike did not suffer any prejudice. Finally, with regard to the bench conferences where jurors were excused for cause, the trial court determined that under Coney, Wike did have a right to be physically present at the immediate site where juror challenges were exercised. However, the court explained that this right was subject to a harmless error analysis, and that Wike's absence constituted harmless error and that he has suffered no prejudice.
Although under Coney Wike had a right to be present at the site where the juror challenges were exercised, the substantive claims relating to Wike's absence should have been raised either at trial or on direct appeal. Accordingly, only the ineffective assistance of counsel claims relating to Wike's absence were properly raised in his 3.850 motion. We agree with the trial court that Wike has not demonstrated prejudice under Strickland, and therefore, we affirm the trial court's denial of relief as to this claim.

Cumulative Error
Wike's final claim is that the cumulative effect of his alleged errors require that he receive a new trial. However, because no errors have occurred, this claim also is without merit. See Rose v. State, 774 So.2d 629, 635 n. 10 (Fla.2000); see also Downs v. State, 740 So.2d 506, 509 (Fla. 1999) (concluding that where allegations of individual error do not warrant relief, a cumulative error argument based thereon is without merit).
For the above reasons, we affirm the trial court and reject all of Wike's claims on appeal. We commend the trial court, whose diligence in providing a well-documented and well-analyzed order greatly assisted this Court in this case.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] The fifteen claims were: (1) violation of the right to speedy trial; (2) denial of Wike's right to be present at all stages of the trial; (3) unconstitutional arrest; (4) erroneous admission into evidence of the fruit of the unconstitutional arrest; (5) illegal search of Wike's parents' home; (6) insufficiency of the evidence to support conviction; (7) ineffectiveness of counsel in failing to achieve suppression of evidence; (8) ineffectiveness of counsel for failing to investigate witnesses and present alibi evidence; (9) ineffectiveness of counsel in failing to move for change of venue; (10) ineffectiveness of counsel for failure to ensure Wike's presence at all critical stages of trial; (11) ineffectiveness of counsel for failing to ensure Wike's presence at side-bar conferences; (12) ineffectiveness of trial counsel in failing to obtain a jury drawn from a fair cross section of the community; (13) ineffectiveness of counsel at the first resentencing for allowing the state to have the final closing argument; (14) ineffectiveness of counsel at all three penalty phases; and (15) a Brady claim of state suppression of exculpatory evidence.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] Wike's appellate brief does not raise the issue of ineffective assistance for failing to move for change of venue during resentencing, and appellate counsel clarified at oral argument that his claim on this issue is in fact limited to trial counsel's ineffectiveness during the guilt phase.
[4] The trial court found that of the 75 individuals in the venire, 42 indicated that they had at least some knowledge of the case. Only 6 individuals, who were excused for cause, indicated that they would have difficulty acting impartially because they had already formed opinions concerning Wike. Of the 15 individuals impaneled as jurors or alternates, only 8 indicated having at least some prior knowledge of the case and were questioned individually as to this issue. Each juror indicated that he or she had not formed any fixed opinions as to Wike's guilt, and therefore, could sit as an impartial juror.
[5] As an initial matter, we reject the State's argument that Wike did not preserve this issue for appeal. Wike raised this issue in his 3.850 motion and he presented testimony on it at the evidentiary hearing. Accordingly, this issue has been adequately preserved for appellate review.
[6] In support of that proposition, the trial court cited Wright v. State, 688 So.2d 298 (Fla.1996), in which this Court stated, "[T]he general qualification process is not `a critical stage of the proceedings requiring the defendant's presence.'"
[7] Because the Strickland standard requires establishment of both the deficiency and the prejudice prongs, when a defendant fails to make a showing as to one of the prongs, it is not necessary to delve into whether the defendant has made a showing as to the other prong. 466 U.S. at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one."); see also Downs v. State, 740 So.2d 506, 518 n. 19 (Fla.1999) (no need to address prejudice prong where defendant failed to establish deficient performance element); Kennedy v. State, 547 So.2d 912, 914 (Fla.1989).