845 So.2d 120 (2003)
STATE of Florida, Appellant, Cross-Appellee,
v.
Jimmie Lee CONEY, Appellee, Cross-Appellant.
Jimmie Lee Coney, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC01-1185, SC02-900.
Supreme Court of Florida.
March 6, 2003.
Rehearing Denied May 2, 2003.
*124 Charles J. Crist, Jr., Attorney General and Lisa A. Rodriguez, Miami, FL and Scott A. Browne, Tampa, FL, Assistant Attorneys General, for Appellant, Cross-Appellee/Petitioner.
William M. Hennis, III, Assistant Capital Collateral Regional Counsel, Fort Lauderdale, FL, for Appellee, Cross-Appellant/Respondent.
SHAW, Senior Justice.
The State of Florida appeals an order of the circuit court vacating the sentence of death imposed on Jimmie Lee Coney and granting a new penalty phase proceeding before a jury pursuant to his first motion filed under Florida Rule of Criminal Procedure 3.850 following an evidentiary hearing. Coney cross-appeals. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm. Coney also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(9), Fla. Const. We deny the petition.

I. FACTS
The facts of the underlying crime are set forth fully in this Court's opinion on direct appeal, which provides in part:
Jimmy Coney set his putative jailhouse lover ablaze. Coney was incarcerated in the Dade Correctional Institution (DCI) serving a 420-year sentence for sexual battery, robbery, burglary with assault, and attempted murder, all arising from the assault of a twelve-year old girl in 1976. While at DCI, Coney's homosexual lover, Patrick Southworth, spurned him. Coney obtained a key to Southworth's cell, entered at about 5 a.m., April 6, 1990, doused him with a flammable liquid, and set him afire. Southworth was burned over a large portion of his body, remained conscious for several hours, lapsed into unconsciousness, and died the following day. No one saw the crime take place except Southworth, who awoke when the liquid was splashed on him. An empty "butt can" was found under Southworth's bunk, and a shoebox containing empty soda cans, tissue paper, and cell keys was found in a garbage container near the fire. The cans contained trace amounts of a flammable liquid and the keys fit Southworth's cell door.

*125 A prison official testified at trial that Southworth told him shortly after he was burned that when he felt the liquid poured on him he looked up and saw James Coney. He said Coney set him on fire because he, Southworth, is homosexual. The paramedic who treated the victim testified that Southworth told him that his lover set him on fire because he, Southworth, left him. The prison officer who accompanied Southworth to the hospital testified that Southworth told him that Jimmie Coney did it because he, Southworth, would no longer have sex with him.
Inmate Young testified that a week before the murder Coney asked him to get some lacquer thinner from the prison auto shop. Young gave him the liquid in a soda can. Inmate Hoover testified that Coney and Southworth were often seen together touching and that Coney introduced Southworth to Hoover as "his boy," i.e., his homosexual lover. On the day before the murder, Coney seemed angry at Southworth and told Hoover, "I'm going to get that motherfucker.... I'm going to burn his ass." Coney's cellmate, inmate Jones, testified that at 4 a.m. on the night of the murder, Coney awoke, took the shoebox later found near the fire from under his bed, poured paint thinner from two soda cans into a "butt can," left the cell, and returned later announcing, "I got the key."
Coney was convicted of first-degree murder and arson. The state put on the following witnesses during the penalty phase: Former Assistant State Attorney Jacobs testified concerning the details of Coney's prior rape of an eighteen-year-old woman who had car trouble. Coney abducted her, bit her on the face and leg, and raped her. Next, a young woman testified that Coney forced his way into her house when she was twelve years old and sexually assaulted and strangled her, leaving her for dead. The woman's mother testified concerning her daughter's condition when she, the mother, arrived home following the assault. Coney, in turn, put on eight witnesses, including relatives who testified concerning his childhood and upbringing.
Coney v. State, 653 So.2d 1009, 1010-11 (Fla.1995).
The jury recommended death by a seven-to-five vote, and the judge imposed a sentence of death based on five aggravating circumstances[1] and no mitigating circumstances. Coney raised ten issues on appeal.[2] This Court struck one aggravating *126 circumstance[3] and affirmed. On March 24, 1997, Coney filed in circuit court an initial "shell" rule 3.850 motion and on August 5, 1999, an amended motion, raising twenty-two issues.[4] The circuit court on December 13-15, 2000, conducted an evidentiary hearing on two claims of ineffectiveness of trial counsel (and on a conflict of interest claim to the extent it had an impact on the ineffectiveness claims) and granted partial relief, vacating the death sentence and ordering a new penalty phase proceeding before a jury. The State appeals, raising a single issue,[5] and Coney *127 cross-appeals, raising seven issues.[6] Coney also has filed in this Court a petition for a writ of habeas corpus, raising three issues.[7]

II. RULE 3.850 MOTION
As noted above, the State appeals the circuit court order vacating Coney's death sentence and granting a new penalty phase proceeding before a jury. Coney cross-appeals the circuit court's order to the extent the court rejects his remaining rule 3.850 claims.

A. Ineffectiveness of Trial Counsel

The following disparate facts are relevant to this claim. During the penalty phase of the trial, defense counsel presented several witnesses, including relatives and friends of Coney, who testified in general terms concerning his childhood and upbringing. No mental health mitigation was presented. Trial counsel testified at the evidentiary hearing below. Due to a fee dispute, the court-appointed defense psychiatrist, Dr. Castiello, never examined Coney prior to trial or later; he never testified at trial and did not testify at the evidentiary hearing. Two other defense mental health experts, Drs. Mutter and David, examined Coney shortly before the penalty phase of the trial and submitted brief reports. Neither was called to testify at trial; both testified at the evidentiary hearing below.
Two additional defense mental health experts, Drs. Hyde and Eisenstein, examined Coney prior to the evidentiary hearing, testified at the evidentiary hearing, and adduced extensive evidence of mitigating circumstances. Their testimony was rebutted by the State's mental health expert, Dr. Ansley, who also examined Coney prior to the evidentiary hearing and testified at the hearing. The circuit court weighed the conflicting testimony of the various witnesses and ruled that trial counsel's performance was both deficient and prejudicial as to the penalty phase but not the guilt phase. The State appeals.
The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), set forth the following two-pronged standard of proof for a trial court to apply when evaluating a claim of ineffectiveness of trial counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in *128 the adversary process that renders the result unreliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The Court in Strickland addressed further both the first[8] and second[9] prongs of the above test and noted that both prongs are mixed questions of law and fact.[10]
This Court in Stephens v. State, 748 So.2d 1028 (Fla.1999), set forth the abiding standard of review for an appellate court to apply when reviewing a trial court's ruling on an ineffectiveness claim. We later summarized that standard as follows:
The standard of review for a trial court's ruling on an ineffectiveness claim also is two-pronged: The appellate court must defer to the trial court's findings on factual issues but must review the *129 court's ultimate conclusions on the [performance] and prejudice prongs de novo.
Bruno v. State, 807 So.2d 55, 61-62 (Fla. 2001).
In the present case, after hearing the conflicting testimony, the circuit court concluded that counsel's performance was deficient under the first prong of Strickland based on the following reasoning:
Trial counsel, Manuel Casabielle, was appointed to represent Mr. Coney by the original trial judge, Roy Gelber. Mr. Casabielle testified at the evidentiary hearing. He acknowledged that this was the first capital case he had handled, that he found Mr. Coney to be a difficult client, that he did not talk to Mr. Coney about the death penalty since Mr. Coney did not want to talk about it, and that, although he was aware of Mr. Coney's prior rape cases, he did not talk to prior counsel or review prior court records to determine if there was any information which may bear on the defendant's mental status.
Further, although in April 1991, almost eleven months before the trial began in February 1992, Mr. Casabielle filed a motion to have Coney psychologically evaluated, he has no recollection as to whether an evaluation was actually performed by the court-appointed psychiatrist, Dr. Castiello. In fact, there is no record of a report having been prepared by Dr. Castiello and no bill submitted by Dr. Castiello. There is, however, a note in Mr. Casabielle's file dated February 27, 1992 (the day after the defendant was found guilty of first degree murder) saying that Dr. Castiello would not evaluate the defendant because the County would not pay him more than $150.00. Before trial, after the case was assigned for trial to the undersigned judge, Mr. Casabielle assured the court that he would be prepared to proceed to the penalty phase of the trial two weeks following the guilt phase, should the jury convict the defendant of first degree murder. At that time, Mr. Casabielle affirmatively stated that a psychological evaluation of the defendant had been conducted. It appears that this statement was not true. Moreover, it is clear that Mr. Casabielle was not planning to investigate the defendant's background until it became necessary, that is, until after a jury would find the defendant guilty of a capital offense.
The events following the conviction of the defendant on February 26, 1992, further demonstrate the inadequacy of the legal representation afforded the defendant. Several days before the penalty phase began, the defendant was finally examined by two doctors selected by trial counsel: a psychiatrist, Dr. Charles Mutter, and a neurologist, Dr. Noble David. Neither doctor was called to testify at the penalty phase. Both testified at the post-conviction hearing. Their testimony reflects the inadequacy of their cursory and misguided evaluations, inadequacy caused in large part by the inadequacy of trial counsel's hurried preparation for these evaluations.
Mr. Casabielle furnished little or no background information to the doctors, did not attend the evaluations, and did not believe it was his responsibility to explain to the doctors the meaning of statutory mitigating factors under the law. It seems that Mr. Casabielle, himself, was not familiar with the law regarding mental health mitigating evidence. Dr. Mutter's report, dated March 9, 1992, evidences his confusion. First Dr. Mutter states that "The purpose of the evaluation was to evaluate [the defendant] for aggravating or mitigating circumstances." However, rather *130 than referring to specific statutory mitigating factors, the doctor opines about the defendant's competency to stand trial:
He currently understands his legal situation, the range and nature of potential penalties, the role of his attorney, the prosecutor, the judge and the jury. Additional questioning clearly indicated his awareness of the requirements of the law.
Were that not enough to alert trial counsel that he needed either to clarify the issues for Dr. Mutter or seek an evaluation from a more knowledgeable expert, Dr. Mutter's concluding paragraph surely should have done so.
It is my opinion that Mr. Coney is competent to assist counsel in sentencing and future legal proceedings. Based on his allegations of being not guilty, there do not appear to be any issues that would deal with aggravating or mitigating circumstances in his case. Assuming there has been nonviolent behavior in the past six years, this would certainly be strongly presumptive that he was trying to conform his conduct to the prison system. I do not see any psychiatric issue whatsoever.
In reviewing this inexplicable conclusion at the post-conviction hearing, Mr. Casabielle had to agree that it did not make sense.
. . . .
Turning now to Dr. David's report, and to the testimony he gave during the post-conviction evidentiary hearing, it appears that the only information Dr. David received about Mr. Coney's background came from Mr. Coney himself. Based on that information and a one-hour neurological examination conducted while the defendant was handcuffed and in shackles, Dr. David found "no evidence of neurologic disease or history that would suggest important neurologic impairment." He did, however, recommend that the defendant undergo neuropsychological testing which Dr. David mistakenly believed had already been scheduled. Trial counsel failed to follow up on this suggestion.
Despite recognizing that he was without testimony from any mental health expert that could assist Mr. Coney in any way, Mr. Casabielle asked for no delay in the sentencing hearing, no further examination by other doctors, and, instead, asked that the doctor's reports be sealed, and proceeded to the penalty phase hearing. There, with only hastily obtained, fragmented testimony from family members and friends of Mr. Coney, he painted this picture. The defendant's early years in rural Georgia where he was raised principally by his supportive and religious maternal grandparents were described. When the defendant was three years old, he contracted polio, was hospitalized for six months, was left with a limp and stayed behind in Georgia when his mother moved to Miami with her other two children. Several years later, his mother married and the defendant joined the family in Miami. Although several witnesses said that the relationship between the defendant and his step-father was not good, they noted only one incident in which the step-father struck the defendant. One family member, Jessie Coney, described the step-father as being "very good" and stated he was not aware of any fights between the step-father and the defendant. Other than a few allusions to the defendant's recent religious conversion and his attempts to help his sister and brother give up their drug habits, that was it. This testimony *131 supplied no evidence of mitigating circumstances.
As outlined above, trial counsel's performance was plainly deficient. He failed to obtain competent medical evaluations of his client sufficiently in advance of trial so that the expert opinions could be properly analyzed and the experts furnished with background information from past court proceedings and prison records regarding the defendant's mental deficiencies and poor impulse control. He failed to devote the time necessary to do a thorough investigation of the defendant's background. And, he failed to remedy these shortcomings by seeking additional time and resources from the court in preparation for the penalty phase.
The circuit court further concluded that counsel's performance was prejudicial under the second prong of Strickland based on the following reasoning:
Under the second prong of the Strickland test, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome ..." Strickland v. Washington, 466 U.S. 668[, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984).
Applying this to the penalty phase of a case, the question becomes, but for counsel's deficient performance would the defendant have been sentenced to life in prison rather than to death? In Florida, the sentencing scheme requires that, first, the jury weigh the aggravating and mitigating factors and recommend to the court, by a majority vote, whether life or death is the appropriate sentence. Next, the court must independently consider the aggravating and mitigating circumstances and reach its decision on the appropriate penalty, giving great weight to the jury's advisory sentence. Tedder v. State, 322 So.2d 908 (Fla.1975).
In this case, by the thinnest margin allowable, seven to five, the jury recommended the imposition of the death penalty. If only one of the seven jurors voting for death had been persuaded to change her or his vote, the recommendation would have been for a life sentence and, in view of the law requiring the presence of compelling evidence to override a jury's recommendation of life, the court would likely have followed the jury recommendation and sentenced the defendant to life in prison.
Considering the evidence offered by the defendant at the post-conviction hearing, particularly the testimony of Dr. Thomas Hyde, a highly qualified behavioral neurologist, and Dr. Hyman Eisenstein, a clinical psychologist, who administered a battery of neuropsychological tests to Mr. Coney, each of whom concluded that the defendant suffers from brain dysfunction and psychiatric illness, it is likely that a jury would have been persuaded to recommend a penalty other than death.
Dr. Hyde has impressive credentials. In addition to being a board-certified neurologist, he obtained a doctorate in neuroscience and has worked for the last twelve years at the National Institute of Mental Health doing research into the biological basis of mental illness. He received his undergraduate and graduate degrees from the University of Pennsylvania. His opinion is summarized in the following excerpts from his hearing testimony:
DR. HYDE: I found on his examination that he had mild memory deficits, on mental status testing, and one frontal release sign. Memory deficits *132 are suggestive of some temporal lobe dysfunction. The frontal release signs suggest some degree of frontal lobe dysfunction, and I believe that with that brain dysfunction, what we call organic brain dysfunction, there's some element of his behavior that is mediated by abnormal brain function.
In addition, in the psychiatric portion of the interview he had criteria that met the criteria for major recurrent depression, quoting the DSM 4 Standards. And he also had some history of emotional sexual and physical abuse by his self-report which also predisposed him towards later neuropsychiatric problems.
... I believe that this gentleman has had long-standing impulse control problems and behavior problems and those impulse control problems are most likely mediated by frontal lobe dysfunction. (Tr. Post Conv. Hr'g at 284-85, 331.)
Dr. Eisenstein administered ten to twelve hours of neuropsychological tests to Mr. Coney and came away with the opinion that "the defendant, Mr. Coney, was suffering from extreme mental and/or emotional impairment that was present at the time of the commission of the crime." (Tr. Post-Conv. Hr'g at 423.). More specifically, Dr. Eisenstein determined it was likely that Mr. Coney had impairment to the frontal lobe of his brain, an impairment which would affect his ability to make cognitive changes, and a deficit in his right brain functioning, resulting in impulsive behavior.
Admittedly, these opinions of Dr. Hyde and Dr. Eisenstein were vigorously challenged by the state. Through cross-examination, the state was able to point out evidence of the witness' bias and information about the defendant which may not have come to light had these witnesses not been called to testify. For example, since both experts relied on prison records in their evaluations of Mr. Coney, those records, including information which would likely be harmful to Mr. Coney would be available for review by the jury. Further, the state's expert neuropsychologist, Dr. Jane Ansley, who interviewed the defendant and administered many of the same tests as did Dr. Eisenstein, concluded that the defendant did not suffer from any significant psychological disorder or organic brain damage. However, it is peculiarly within the province of the jury to sift through the evidence, assess the credibility of the witnesses, and determine which evidence is the most persuasive. The court cannot conclude that the evidence presented by the defendant, if heard by the jury, would not have tilted the balance in favor of a recommendation of life.
Therefore, for the reasons stated, the defendant's motion to set aside his sentence of death is granted.
The State disagrees with the trial court's assessment of this claim and instead contends that "given the especially gruesome and slow death of the victim ... the presentation of heavily rebutted expert testimony that Defendant suffered from neurologic impairment would not have yielded a reasonable probability that Defendant's sentence would have been different.... [T]he lower court failed to properly assess the credibility of the dueling experts that testified at the evidentiary hearing and weigh the evidence." We disagree.
As noted above, a circuit court's ruling on an ineffectiveness claim is a mixed question of law and fact, and a reviewing court must defer to the circuit court's factual findings as long as those findings are supported by competent, substantial *133 evidence in the record.[11] Competent, substantial evidence is tantamount to legally sufficient evidence, and a reviewing court must assess the record evidence for its sufficiency only, not its weight.[12] Evidence contrary to the circuit court's ruling is outside the scope of the inquiry at this point, for a reviewing court cannot reweigh the "pros and cons" of conflicting evidence.[13] In other words, an appellate court cannot use its review powers as a mechanism for reevaluating conflicting evidence and exerting covert control over the factual findings.[14] When evaluating an ineffectiveness claim, an appellate court may review de novo only the trial court's assessment of the law, not its assessment of the facts.[15]
Applying the Stephens standard of review, set forth above, to the circuit court's ruling on this claim, we conclude that the court's factual findings are supported by competent, substantial evidence in the record, and its ultimate conclusions on the performance and prejudice prongs comport with the law. We find no error.

B. Conflict of Interest

The gist of Coney's conflict of interest claim is that the original trial judge in this case appointed defense counsel in return for a twenty-five percent kickback of counsel's special public defender fee, which would be paid at the end of the case. Coney claims that this kickback scheme gave both the judge and counsel an incentive to keep counsel on the case to the detriment of Coney. We disagree.
The United States Supreme Court in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), set forth a two-pronged standard of proof for a trial court to apply when evaluating a claim of conflict of interest of trial counsel. The Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), explained:
One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In Cuyler v. Sullivan, this Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.... Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, supra, 446 U.S. at 350[, 100 S.Ct. 1708].
Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (citation omitted)(emphasis added). Once a defendant satisfies both prongs of the Cuyler test, prejudice is presumed and the defendant is entitled to relief. Id.
This Court subsequently articulated the proper standard of review for an appellate court to apply when reviewing a mixed question of law and fact of this sort:

*134 If the ruling consists of a mixed question of law and fact addressing certain constitutional issues (e.g., probable cause, reasonable suspicion, the "in custody" requirement under Miranda, ineffectiveness of counsel), the ultimate ruling must be subjected to de novo review but the court's factual findings must be sustained if supported by competent substantial evidence. See, e.g., Stephens v. State, 748 So.2d 1028 (Fla.1999).
Glatzmayer, 789 So.2d at 301-02 n. 7.
In the present case, the circuit court below addressed this claim in its written order:
The defendant sets forth in claim XIV of his amended motion that trial counsel "was burdened by an actual conflict of interest adversely affecting counsel's representation." The conflict alleged is not the typical one of an attorney representing conflicting interests of two clients. Rather, the defendant claims there was a conflict between the attorney's self-interest in continuing to receive appointments from the trial judge and his duty to represent his client. The defendant does not explain how these two interests are antithetical. But even assuming they are, the question remains whether the client's interest was compromised, that is, was the representation afforded the defendant deficient. See Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Buenoano v. Dugger, 559 So.2d 1116 (Fla.1990). Since this is precisely the question addressed in the defendant's other claims of ineffective assistance, the question need not be answered again. The court has already concluded that counsel's performance was deficient in the penalty phase and was adequate in the guilt phase. Counsel's motivation is not relevant.
Applying the Glatzmayer standard of review, set forth above, to the circuit court's ruling on this claim, the court appears to have relied on its earlier factual findings and, as noted above, those findings are supported by competent substantial evidence in the record. Further, the court's ultimate ruling on this claim comports with the law. We find no error.

C. Ineffectiveness in the Guilt Phase

This claim is two-pronged. First, Coney claims that the trial court erred in failing to grant an evidentiary hearing on many of the subissues relating to his claim that trial counsel was ineffective during the guilt phase of the trial. Second, Coney contends that trial counsel was ineffective during the guilt phase in the following ways: (a) failing to object to and otherwise preserve sundry jury selection issues; (b) failing to preclude and impeach testimony concerning Southworth's dying declarations; (c) failing to obtain a pretrial evaluation of Coney by a mental health professional; (d) failing to challenge the State's case (i.e., by failing to call various inmates and prison staff who could have testified concerning the circumstances of the crime, failing to properly handle witnesses, failing to retain an expert on flammable liquids, failing to object to improper prosecutorial argument in closing, and failing to object to certain instructions); and (e) failing to ensure Coney's presence during critical stages of the proceedings.
This Court in LeCroy v. Dugger, 727 So.2d 236 (Fla.1998), articulated the following standard of proof for a circuit court to apply when determining whether an evidentiary hearing is required on a rule 3.850 claim:
The standard for determining whether an evidentiary hearing is required on an ineffectiveness claim is as follows:
A motion for postconviction relief can be denied without an evidentiary *135 hearing when the motion and the record conclusively demonstrate that the movant is entitled to no relief. A defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing. The defendant must allege specific facts that, when considering the totality of the circumstances, are not conclusively rebutted by the record and that demonstrate a deficiency on the part of counsel which is detrimental to the defendant.
LeCroy, 727 So.2d at 239 (quoting Kennedy v. State, 547 So.2d 912, 913 (Fla.1989)).
This Court subsequently set forth the proper standard of review for an appellate court to apply when reviewing a circuit court's ruling on whether to grant an evidentiary hearing on a rule 3.850 claim:
To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record. See Fla. R.Crim. P. 3.850(d). Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record.
Peede v. State, 748 So.2d 253, 257 (Fla. 1999).
In the present case, the circuit court addressed the jury selection issue in its written order:
The defendant asserts that trial counsel's questioning of jurors during voir dire was incomplete and otherwise inadequate. In particular he criticizes the manner in which the prospective jurors were questioned about their knowledge of the book "Maximum Morphonios" by Judge Ellen Morphonios. Judge Morphonios had presided over the 1976 case in which Coney was found guilty of raping a twelve-year old girl, and, in Judge Morphonios' book she described the case as one of the worst she had ever seen. The prospective jurors were, in fact, questioned about their knowledge of the book. Only one member of the panel seated as a juror, Walter Moore, stated that he had read the book. He was questioned separately to determine what parts he read and remembered and how the book may have influenced him. Counsel's questions were appropriately phrased to elicit from Mr. Moore what he remembered from the book without describing the very details that may have been prejudicial to the defendant. Nothing Moore said necessitated further questioning or provided a basis to excuse him from serving as a juror. (R. 1048-49, 1082-85, 1090-92) The other points raised by the defendant regarding jury selection lack merit and/or were raised and rejected on direct appeal.
As for Coney's claim that counsel was ineffective vis-a-vis Southworth's dying declarations, the circuit court also addressed this issue:
The defendant claims that trial counsel rendered ineffective assistance at the pre-trial motion hearing regarding the admissibility of the victim's dying declarations. All of the statements were made by the victim immediately after he was burned and before he lapsed into unconsciousness a few hours later. He died the following day.
Although the defendant argues that trial counsel should have challenged the admissibility of the statements by offering evidence to impeach the victim, the defendant does not suggest what evidence would be relevant to the victim's attitude toward death or the victim's need to tell the truth when dying. Or *136 what evidence would show that the victim did not accurately observe the facts recounted, all of which would affect the admissibility of dying declarations. See State v. Weir, 569 So.2d 897 (Fla. 4th DCA 1990). Rather, the defendant argues that the victim's statements identifying Mr. Coney as the person who ignited the fire were lies, and that trial counsel should have offered evidence at trial of the victim's positive HIV status to show the victim's motive for inculpating the defendant. He speculates that the victim, believing that Coney gave him AIDS, may have been angry at Coney, and therefore, falsely accused Coney as the murderer. This may be good fiction but it has no relevance to the facts of this case. Here, the victim was dying because he was being burned alive, not because he was dying from AIDS. Common sense dictates he would have wanted to identify his killer. Nor do any of the other matters suggested by the defendant in his criticism of trial counsel bear on the truthfulness of the dying declarations. Neither prong of Strickland has been satisfied.
The circuit court then proceeded to address each of Coney's remaining claims of ineffectiveness of guilt phase counsel and concluded as follows:
The remaining challenges to trial counsel's performance during the guilt phase are likewise without merit. Trial counsel adequately prepared for the guilt phase, having had his investigator contact sixty-one inmates for information, having called numerous witnesses, including the defendant, at trial, and having appropriately challenged the state's evidence against Mr. Coney. That there may have been more that trial counsel could have done or that new counsel in reviewing the record with hindsight would handle the case differently, does not mean that trial counsel's performance during the guilt phase was deficient. Cherry v. State, 659 So.2d 1069 (Fla.1995); Bryan v. Dugger, 641 So.2d 61 (Fla.1994). Mr. Casabielle's performance at trial fell within the "broad range of reasonably competent performance under prevailing professional standards." Maxwell v. Wainwright, 490 So.2d 927 (Fla.1986) at 932.
To the extent Coney claims the circuit court erred in failing to grant an evidentiary hearing on the issues relating to this claim, we disagree. Applying the above standard of review to the circuit court's ruling, the court has adequately shown that Coney's claims are either facially invalid or conclusively refuted by the record. To the extent that Coney claims the circuit court erred in ruling that trial counsel was not ineffective in the guilt phase, we also disagree. Applying the Stephens standard of review, set forth above, to the circuit court's ruling on this claim, the court's findings are supported by the record, and its ultimate conclusions on the performance and prejudice prongs comport with the law. We find no error.

D. Public Records

After conducting an in camera inspection, the circuit court denied Coney's public records request for certain documents. Coney now asks this Court to review the sealed records. We decline to do so. This Court in Walton v. Dugger, 634 So.2d 1059 (Fla.1993), set forth the following procedure for a trial court to employ in resolving a public records dispute:
When, as in the instant case, certain statutory exemptions are claimed by the party against whom the public records request has been filed or when doubt exists as to whether a particular document must be disclosed, the proper procedure is to furnish the document to the *137 trial judge for an in camera inspection. At that time, the trial judge can properly determine if the document is, in fact, subject to a public records disclosure.
Walton, 634 So.2d at 1061-62 (citation omitted).
A circuit court's ruling on a public records request filed pursuant to a rule 3.850 motion will be sustained on review absent an abuse of discretion. See, e.g., Mills v. State, 786 So.2d 547, 552 (Fla.2001). This Court has explained further:
Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.
White v. State, 817 So.2d 799, 806 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 699, 154 L.Ed.2d 638 (2002).
In the present case, Coney does not claim that the circuit court erred in denying his public records request as to certain sealed documents. Rather, he asks only that this Court review those sealed documents. Coney does not claim, nor does the record show, that the trial court abused its discretion in withholding the documents. We find no error.

E. Other Penalty Phase Claims[16]
Coney claims that the circuit court erred in denying relief on the following penalty phase claims: (a) Florida's capital sentencing statute is unconstitutional; (b) the trial court failed to find nonstatutory mitigation; (c) the jury should not have been able to consider Coney's prior convictions; (d) the arson aggravator constituted an automatic aggravator for the crime of felony murder; (e) the jury was wrongly told that its role was merely advisory; and (f) the prosecutor made improper arguments during closing. We disagree.
To the extent Coney's claims on this point are claims of trial court error, such claims generally are not cognizable in a rule 3.850 motion.[17] To the extent Coney's claims on this point are discernable from the record, they constitute pure questions of law and are subject to de novo review.[18] The circuit court below properly denied relief on the following grounds: (a) procedurally barred (could have been raised on direct appeal); (b) procedurally barred (was raised on direct appeal); (c) procedurally barred (could have been raised on direct appeal); (d) procedurally barred (could have been raised on direct appeal); (e) procedurally barred (could have been raised on direct appeal); (f) procedurally barred (could have been raised on direct appeal). We find no error on this claim and we reject Coney's remaining rule 3.850 claims.[19]

*138 III. HABEAS CORPUS
As noted above, Coney has filed in this Court a petition for a writ of habeas corpus, raising two claims of ineffectiveness of appellate counsel and one claim of a violation under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

A. Failure to Raise Preserved Errors

The gist of Coney's claim on this point is that appellate counsel was ineffective in failing to raise on appeal the following guilt phase issues that were preserved by objection at trial: (a) the admission of gruesome photos; (b) the reliability of McBee's testimony concerning the lacquer thinner that was used to set Southworth afire, and the admission of sundry items connected to the crime (e.g., a shoe box, soda cans, a lock and keys, and a "butt" can); and (c) the testimony of various witnesses. Further, Coney claims that appellate counsel was ineffective in failing to raise on appeal the following penalty phase issues that were preserved by objection at trial: (a) the validity of the HAC instruction; and (b) the admission of gruesome photos. We disagree.
This Court in Rutherford v. Moore, 774 So.2d 637 (Fla.2000), articulated the following two-pronged standard of proof for a court to apply when analyzing a claim of ineffectiveness of appellate counsel:
When analyzing the merits of [an ineffective assistance of appellate counsel] claim, "[t]he criteria for proving ineffective assistance of appellate counsel parallel the Strickland standard for ineffective trial counsel." Thus, this Court's ability to grant habeas relief on the basis of appellate counsel's ineffectiveness is limited to those situations where the petitioner establishes first, that appellate counsel's performance was deficient because "the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and second, that the petitioner was prejudiced because appellate counsel's deficiency "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result."
Rutherford, 774 So.2d at 643 (footnote and citation omitted).
In the present case, appellate counsel submitted a comprehensive 100 page brief to this Court, the maximum permitted under the Florida Rules of Appellate Procedure. The brief raised ten major allegations of error and several subissues. Counsel prevailed on the following points: the trial court erred in allowing juror challenges to be exercised during a bench conference when Coney was not present;[20] the trial court erred in admitting certain testimony concerning one of Coney's prior violent felonies;[21] and the trial court erred in finding that the aggravating circumstance of "creating a great risk of death to many persons" had been established.[22] In his present petition, Coney has not shown that any of his current claims are more viable than the claims raised by appellate counsel.
Specifically, we reject Coney's guilt phase claims on this point for the following reasons. (a) Coney claims that appellate counsel should have sought to *139 exclude gruesome photos. Trial counsel, however, objected to the admission of several photos based on relevancy, not gruesomeness. This issue thus was not preserved for appellate review. (b) Coney claims that appellate counsel was ineffective in failing to carry forward trial counsel's objections to the testimony of police lab technician McBee concerning a sample of lacquer thinner that was obtained from the prison auto body shop.[23] Coney also claims that appellate counsel failed to carry forward trial counsel's objections concerning the shoe box, soda cans, and "butt" can. Coney, however, fails to show how the trial court erred in ruling on these matters. And (c) Coney claims that appellate counsel was ineffective in failing to carry forward various other guilt phase objections of trial counsel, but Coney again fails to show how the trial court erred in responding to those objections.
Similarly, we reject Coney's penalty phase claims on this point.[24] (a) Coney claims that appellate counsel was ineffective in failing to carry forward trial counsel's objection concerning the constitutionality of the HAC instruction. The record, however, shows that the objection was based on the sufficiency of the evidence, not the constitutionality of the instruction. (b) Coney claims that the trial court, over objection, allowed gruesome autopsy photos to be admitted. Coney, however, does not say which photos were impermissible and does not show how the court abused its discretion in admitting the photos. In sum, Coney has failed to show that appellate counsel rendered deficient performance under Strickland by failing to raise these issues on appeal; nor has Coney shown how he was prejudiced by appellate counsel's performance. We reject this claim.

B. Failure to Raise Other Issues

The gist of Coney's claim on this point is that appellate counsel was ineffective in failing to raise on appeal the following issues: (a) conflict of interest; (b) this Court's allegedly improper harmless error analysis concerning the striking of an aggravating circumstance; and (c) the constitutionality of the death penalty.
We reject each of Coney's claims on this point for the following reasons. (a) As for Coney's claim that trial counsel suffered from a conflict of interest, the record fails to show any adverse effect on trial counsel's performance other than that discussed above under Coney's ineffectiveness claim. (b) As for Coney's claim that this Court erred in conducting its harmless error analysis after striking one aggravating circumstance, this claim now is moot in light of the circuit court's order granting a new penalty phase proceeding. And (c) as for Coney's claim that Florida's capital sentencing statute is unconstitutional, Coney fails to show that such is the case. In sum, Coney has failed to show that appellate counsel rendered deficient performance under Strickland by failing to raise these issues on appeal; nor has Coney shown how he was prejudiced by appellate counsel's performance. We reject *140 this claim as well as Coney's remaining habeas claim.[25]

IV. CONCLUSION
Based on the foregoing, we affirm the circuit court's order vacating Coney's death sentence, granting a new penalty phase proceeding before a jury, and denying Coney's remaining rule 3.850 claims. We deny his petition for a writ of habeas corpus.
It is so ordered.
ANSTEAD, C.J., and WELLS, LEWIS, QUINCE and CANTERO, JJ., concur.
PARIENTE, J., concurs specially with an opinion.
PARIENTE, J., specially concurring.
I concur in the majority opinion, and write to clarify two matters discussed therein. First, the scope of our review of a trial court's order denying postconviction relief on an ineffective assistance of counsel claim is not the same as an appellate court's review of the sufficiency of evidence to support a conviction. See majority op. at 133. When this Court reviews a judgment based on a guilty verdict, the Court has an obligation to affirm if there is competent, substantial evidence to support the verdict. As we have explained:
As a general proposition, an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.
Tibbs v. State, 397 So.2d 1120, 1123 (Fla. 1981) (footnotes omitted). See also Terry v. State, 668 So.2d 954, 964 (Fla.1996) ("[A] defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment.").
On the other hand, we fully explained in Stephens v. State, 748 So.2d 1028 (Fla. 1999), the reason for our plenary review of ineffective assistance of counsel claims:
The determination of ineffectiveness pursuant to Strickland is a two-pronged analysis: (1) whether counsel's performance was deficient; and (2) whether the defendant was prejudiced thereby. See, e.g., Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998). As the Supreme Court explained in Strickland:

Ineffectiveness is not a question of "basic, primary, or historical fact." Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement ... both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

Id. at 698, 104 S.Ct. 2052 (citations omitted) (emphasis supplied). Thus, under Strickland, both the performance and *141 prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings.
Further, while the second prong of an ineffectiveness claim is sometimes confused with the prejudice prong of a newly discovered evidence claim, they are distinct. As explained in Strickland:

[T]he newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied) (citation omitted); see Rutherford, 727 So.2d at 220. The second prong of the ineffective assistance of counsel test focuses on the reliability of the proceeding and has never been subject to an abuse of discretion standard of review....
We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position "to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses." Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976). When sitting as the trier of fact, the trial judge has the "superior vantage point to see and hear the witnesses and judge their credibility." Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998), cert. denied, 526 U.S. 1102, 119 S.Ct. 1583, 143 L.Ed.2d 677 (1999). Appellate courts do not have this same opportunity.
Despite this deference to a trial court's findings of fact, the appellate court's obligation to independently review mixed questions of fact and law of constitutional magnitude is also an extremely important appellate principle. This obligation stems from the appellate court's responsibilities to ensure that the law is applied uniformly in decisions based on similar facts and that the defendant's representation is within constitutionally acceptable parameters.
Id. at 1033-34 (footnote omitted).
Thus, unlike an appellate court's determination of whether there is sufficient evidence to support a criminal conviction, an appellate court's review of a trial court's order denying an ineffective assistance claim requires consideration of the entire record that was before the trial court. A review of the entire record is essential to our independent review of the mixed questions of fact and law on the issues of whether counsel rendered ineffective assistance in his or her representation and whether such conduct undermines our confidence in the outcome of the proceeding either as to the guilt phase or as to the penalty phase. See Stephens, 748 So.2d at 1035 ("Based on the trial court's findings of fact and our review of the record, we *142 agree with the trial court's conclusions as to both Strickland prongs and the ultimate finding of ineffective assistance of counsel.") (emphasis supplied).
Our review cannot and should not be limited to the trial court's factual findings contained in the trial court's order. Therefore, the statement in the majority opinion that "[e]vidence contrary to the circuit court's ruling is outside the scope of our inquiry" should not be misinterpreted. Majority op. at 133. This statement should not be viewed in any way as altering our obligation as set forth in Stephens to perform a plenary review of all the facts and evidence in the record to determine if trial counsel rendered ineffective assistance of counsel that undermines our confidence in the reliability of either the conviction or the imposition of the death penalty.
Second, I write to clarify that the test of prejudice arising from an attorney's conflict of interest is based on Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). This test is not whether counsel rendered reasonably effective assistance overall but whether the conflict adversely affected counsel's performance. Thus, I would not approve the trial court's conclusion that trial counsel's alleged conflict of interest caused no prejudice based on its finding that counsel's performance was "adequate" in the guilt phase of the trial. See majority op. at 134.
NOTES
[1] The trial court found that the following aggravating circumstances were established:

The murder was committed by a person under sentence of imprisonment; the defendant had been previously convicted of a violent felony; the defendant created a great risk of death to many; the murder was committed during the course of an arson; and the murder was especially heinous, atrocious, or cruel [HAC].
Coney, 653 So.2d at 1011 n. 1.
[2] This Court summarized the issues that Coney raised on direct appeal as follows:

Coney claims the trial court erred in addressing the following matters: 1) refusing to give a requested jury instruction on dying declarations; 2) admission of dying declarations concerning Coney's motive for the assault; 3) Coney's absence during certain pre-trial and trial proceedings; 4) limiting of defense counsel's questioning of jurors concerning the State's burden of proof; 5) various other guilt phase issues; 6) testimony of the child rape victim's mother concerning a prior violent felony; 7) improper argument by the prosecutor; 8) proportionality; 9) the aggravating circumstance of knowingly creating a great risk of harm to many; 10) failure to find and weigh nonstatutory mitigation.
Coney, 653 So.2d at 1011 n. 2.
[3] This Court concluded that Coney had not created a great risk of harm to many persons by setting Southworth afire. See Coney, 653 So.2d at 1015.
[4] In his rule 3.850 motion, Coney raised the following claims: (1) "Mr. Coney is being denied his rights ... because access to the files and records pertaining to Mr. Coney's case in the possession of certain state agencies has been withheld"; (2) "Mr. Coney's rights ... were violated by counsel's deficiencies or being rendered ineffective by state action"; (3) "Mr. Coney was denied a fair adversarial testing at the guilt phase of his capital trial. Evidence not presented to Mr. Coney's jury due to state misconduct and defense counsel's ineffectiveness, failure by defense counsel to properly investigate and cross-examine witnesses, as well as evidence that is newly discovered, proves that Mr. Coney is innocent"; (4) "Mr. Coney was denied his rights to the effective assistance of counsel and mental health experts at the guilt/innocence and sentencing phases of his capital trial, when critical information regarding Mr. Coney's mental state was not provided to the jury and judge"; (5) "Mr. Coney was denied the effective assistance of counsel at the sentencing phase of his trial.... Trial counsel was rendered ineffective by the trial court's and state's actions. Trial counsel failed to adequately investigate and prepare mitigating evidence, failed to provide the mental health experts with this mitigation, and failed to adequately challenge the state's case and to object to unconstitutional jury instructions and to adequately object to eighth amendment error"; (6) "Mr. Coney was absent from critical states of the trial"; (7) "Mr. Coney is denied his [rights] and is denied effective assistance of counsel in pursuing his post-conviction remedies because of the rules prohibiting Mr. Coney's lawyers from interviewing jurors"; (8) "execution by electrocution is cruel and/or unusual"; (9) "Florida's capital sentencing statute ... fails to prevent the arbitrary and capricious imposition of the death penalty"; (10) "the eighth amendment was violated by the sentencing court's refusal to find and /or consider the mitigating circumstances clearly set out in the record"; (11) "the Florida Supreme Court failed to conduct a constitutionally adequate harmless error analysis on direct appeal after striking an aggravating factor"; (12) "the jury and judge were provided with and relied upon misinformation of constitutional magnitude in sentencing Mr. Coney to death in violation of Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)"; (13) "Mr. Coney's death sentence is predicated upon an automatic aggravating circumstance"; (14) "trial counsel was burdened by an actual conflict of interest"; (15) "Mr. Coney is insane to be executed"; (16) "Mr. Coney's jury was misled by the comments, questions, and instructions that unconstitutionally and inaccurately diluted the jury's sense of responsibility"; (17) "Mr. Coney's trial was fraught with procedural and substantive errors which cannot be harmless when viewed as a whole"; (18) "Mr. Coney is being denied his right to effective representation by the lack of funding available to fully investigate and prepare his post-conviction pleadings, understanding, and the unprecedented workload on present counsel and staff"; (19) "Mr. Coney's death sentence is fundamentally unfair due to the state's introduction of non-statutory aggravating factors;" (20) "Mr. Coney was denied a fair and impartial trial ... because the trial court permitted the state to introduce gruesome and shocking photographs"; (21) "the trial court erroneously instructed Mr. Coney's jury on the standard by which they must judge expert testimony. The jury made decisions of law that should have been with the province of the court"; and (22) "the improper conduct of Judge Smith created a bias in favor of the state and rendered rulings contrary to the law."
[5] The State raises the following claim in its appeal of the circuit court's order in the rule 3.850 proceeding: the circuit court erred in granting a new penalty phase proceeding in that Coney did not show that trial counsel's performance was deficient or that Coney was prejudiced by counsel's performance.
[6] In his cross-appeal of the trial court's order in the rule 3.850 proceeding, Coney claims that the circuit court erred in denying relief on the following claims (denoted in his present brief as issues 2 through 7):(2) "conflict of interest"; (3) "no adversarial testing at the guilt phase"; (4) "public records"; (5) "no adversarial testing at the penalty phase"; (6) "innocent of the death penalty"; (7) "insane to be executed"; and (8) "cumulative error."
[7] Coney raises the following issues in this petition for a writ of habeas corpus: (1) "appellate counsel failed to raise on appeal numerous issues which warrant reversal that were preserved by objections"; (2) "failure to raise on original direct appeal other rulings"; and (3) "the constitutionality of the first-degree murder indictment must be revisited in light of Apprendi."
[8] As for the first (i.e., performance) prong of the above test, the United States Supreme Court explained further:

As all the Federal Courts of Appeal have now held, the proper standard for attorney performance is that of reasonably effective assistance.... When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.
More specific guidelines are not appropriate.... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.
. . . .
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
Strickland, 466 U.S. at 687-89, 104 S.Ct. 2052 (citations omitted).
[9] As for the second (i.e., prejudice) prong of the above test, the United States Supreme Court explained further:

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.
. . . .
It is not enough for the defendant to show that errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding....
. . . .
Accordingly, the appropriate test for prejudice... [is as follows]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
. . . .
... When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencerincluding an appellate court, to the extent it independently reweighs the evidence would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
Strickland, 466 U.S. at 691-95, 104 S.Ct. 2052 (citations omitted).
[10] See Strickland, 466 U.S. at 698, 104 S.Ct. 2052.
[11] See Stephens v. State, 748 So.2d 1028 (Fla. 1999).
[12] See Almeida v. State, 748 So.2d 922, 932 (Fla.1999). See also Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981) ("Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.").
[13] See, e.g., Morrison v. State, 818 So.2d 432, 451 (Fla.2002) ("It is not this Court's function to ... reweigh conflicting evidence submitted to the trier of fact."); Wuornos v. State, 676 So.2d 966, 971 (Fla.1995) ("[T]his Court does not itself reweigh the evidence on appeal...."); Gunsby v. State, 574 So.2d 1085, 1090 (Fla.1991) ("[A]s an appellate court, we have no authority to reweigh [the] evidence....").
[14] See State v. Glatzmayer, 789 So.2d 297, 301 (Fla.2001).
[15] See Stephens, 748 So.2d at 1034.
[16] We address these penalty phase claims to provide guidance for future proceedings in this case.
[17] See Bruno v. State, 807 So.2d 55, 63 (Fla. 2001) ("A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion....").
[18] See State v. Glatzmayer, 789 So.2d 297, 302 n. 7 (Fla.2001) ("If the ruling consists of a pure question of law, the ruling is subject to de novo review.").
[19] Coney's claim that he is innocent of first-degree murder or innocent of the death penalty was not raised in his rule 3.850 motion and is not properly before the Court. Further, to the extent this is a claim of trial court error, such claims generally are not cognizable in a rule 3.850 motion. See Bruno v. State, 807 So.2d 55, 63 (Fla.2001). As for Coney's claim that he is insane to be executed, Coney acknowledges that this claim is not yet ripe and is being raised only for preservation purposes. Finally, as for Coney's claim of cumulative error, other than the arguments made elsewhere in his present brief Coney provides no basis for this assertion. We reject any other issues or subissues raised by Coney pursuant to the rule 3.850 proceeding.
[20] See Coney, 653 So.2d at 1013.
[21] See id. at 1014.
[22] See id. at 1015.
[23] McBee testified that the sample did not contain toluene, whereas the liquid poured on Southworth did contain toluene. McBee, however, also testified that, if the sample had been mixed with another liquid that did contain toluene, that would explain the difference. Other witnesses testified that Coney obtained one soda can of liquid from the body shop, but that he poured the contents of two soda cans of liquid into the "butt" can used to ignite Southworth.
[24] We address these penalty phase claims to provide guidance for future proceedings in this case.
[25] Coney claims that the trial court's imposition of a sentence of death in this case violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This claim, however, is moot in light of the circuit court's order granting a new penalty phase proceeding.